(No. 30159.                    No. 30194.

ALICE OLSON *et al.*, Appellees, *vs.* GEORGE W. ROSSETTER *et al.*, Appellants.—CELIA RUSS *et al.*, Appellants, *vs.* FRANK W. BLAIR *et al.*, Appellees.

*Opinion filed January 22, 1948—Rehearing denied March 11, 1948.*

Sonnenschein, Berkson, Lautmann, Levinson & Morse, (Herbert M. Lautmann, David Levinson, Bernard Nath, and Isaac E. Ferguson, of counsel,) all of Chicago, for appellants in No. 30159 and for appellees in No. 30194.

Shulman, Shulman & Abrams, (Meyer Abrams, of counsel,) both of Chicago, for appellants in No. 30194, and for appellees in No. 30159.

Mr. Chief Justice Murphy delivered the opinion of the court:

Petitions for leave to appeal were granted in *Olson* v. *Rossetter,* No. 30159, and *Russ* v. *Blair,* No. 30194. The facts of the two cases are so similar as to involve the same basic principles of law and they have been consolidated for opinion.

The real estate which furnishes the background for the controversy in the *Olson case* is located on Belmont

Avenue, Chicago, and is improved with a building devoted to a use for a motion-picture theater, sixty-seven apartments and nine stores. The building was completed in 1925 and about that time the title was encumbered with first and second mortgage liens to secure an aggregate indebtedness of $1,400,000. Some of the earlier maturing bonds were paid but others were defaulted and unsecured indebtedness was created. A proceeding to foreclose the first mortgage lien was instituted and carried through to an order of sale. Before any sale was had, a proceeding was started in the Federal court for a reorganization of the finances of the property under section 77b of the Bankruptcy Act. That court submitted a plan of reorganization to all parties interested. The bondholders' protective committee appeared in said proceeding. The plan which was later adopted and placed in operation required the vesting of the title in a corporation known as 1617 Belmont Company. The bondholders were the beneficial owners of the stock of the corporation, but the plan provided for the selection of a board of trustees consisting of three members to hold the stock for voting purposes. A depositary was named and upon surrender of a bond to the depositary a certificate was issued to the holder of the bond in lieu of the stock. Such certificates were registered by the depositary and were subject to transfer and assignment. The trust agreement, under which the trustees had authority to act, was dated October 15, 1935. Such agreement embodied the substance of what was proposed in the plan in reference to the issuance of the certificates to the bondholders and the authority of the trustees in the matter.

The real estate involved in the *Russ case* is located at the corner of Diversey Boulevard and Pine Grove Avenue, Chicago, and is improved with the building known as the Embassy Hotel. Its financing and the difficulties that followed were much the same as those described in the *Olson case*. A corporation known as the Embassy Hotel Cor-

poration was organized under the laws of the State of Delaware to take the title. Issuance of the stock in lieu of the bonds and the holding of the stock by a board of trustees was of the same pattern as in the former case.

The primary question in each case involves a construction of parts of the trust agreement pertaining to the duration of the trust. A provision in each trust agreement provided that the trust should terminate at the end of the ten-year period following the date of the contract. In another part of the contract, the trustees were authorized to amend, alter or modify the trust agreement. Assuming to exercise a power given them under such clause, the trustees, in each case, adopted a resolution extending the duration of the trust for a period of ten years. If the resolution was sustained, it would extend the period of the trust in the *Olson case* to October 15, 1955, and in the *Russ case* to August 14 of the same year. Plaintiffs in each case attack the resolution of the trustees extending the duration of the trust.

Plaintiffs in the *Olson case* hold a total of 28 trust certificates or shares out of an aggregate of approximately 12,000 shares. There are about 750 certificate holders who are widely scattered, residing in thirty-four States, Washington, D. C., and Belgium. Plaintiffs in the *Russ case* hold trust certificates representing 762 shares out of a total of about 29,750. The defendants in each case are the trustees serving under the trust agreement, and the corporation whose stock is held in trust. The Theater Amusement Company, tenant in possession of that part of the building devoted to theater purposes in the *Olson case,* is also named as a defendant.

Section 1 of article 7 of the trust agreement in the *Olson case,* under a heading designated as "Termination" provides that the trust "shall terminate in any event on the fifteenth day of October 1945, without notice by or to, or action on the part of the trustees, or any other parties

hereto, but it may be terminated at an earlier date by a resolution of two trustees, or by consent of the certificate holders in the manner herein provided."

Section 1 of article 7 of the trust agreement in the *Russ case,* under a heading pertaining to the termination of the trust, is the same language as is contained in the provision in the *Olson case,* except that the date of termination is ten years from the date of the contract, August 14, 1935, and the provision for an earlier termination involves a different procedure. It is provided that an earlier termination may be by resolution of two of the stock trustees or upon written direction signed by holders of stock certificates representing not less than 51 per cent of the stock then held by the trustees.

About five months prior to the expiration of the ten-year period in the *Olson case* and sixty days before the termination date in the *Russ case,* the trustees adopted a resolution extending their respective trust agreements for another ten-year period. Plaintiffs in each case contend that the provisions above quoted, and others of a corroborative character, should be construed as limiting the duration of the trust to the ten years next following the date of the agreement and that the resolution of the trustees extending it for another like period was void and of no effect. Defendants in each case refer to a provision in the respective trust agreements under the head "Miscellaneous" as authorizing the action taken by the trustees extending the trust period. The provision in the Olson contract is "This trust agreement may be amended, altered or modified by the resolution of all the trustees. If it is the opinion of the trustees (which shall be . conclusive) that any such amendment, alteration or modification will materially affect the rights of the holders of trust certificates, the trustees shall notify the registered holders of all trust certificates at the addresses shown on the transfer books of the depositary, of the nature of such amend-

ment, alteration or modification, not less than ten days prior to the date on which it is proposed such amendment, modification or alteration is to become effective, and such amendment, alteration or modification shall not become effective if at or prior to such date, the holders of trust certificates representing 33⅓ per cent or more of the capital stock outstanding issued to the trustees, shall in writing advise the trustees of their objection to and dissent therefrom. Any amendment, alteration or modification which in the opinion of the trustees (and the opinion of the trustees shall be conclusive) is not substantial in character, shall become effective upon the resolution of the trustees." The provision in the trust agreement in the *Russ case* is the same as in the other case except that "No amendment, alteration or modification shall become effective unless the stock Trustees shall have notified the registered holders of all Stock Trust Certificates outstanding hereunder pursuant to Section 1, article 9 hereof, not less than ten (10) days nor more than thirty (30) days prior to the date on which it is proposed such amendment, alteration or modification is to become effective and said amendment, alteration or modification shall have received the affirmative vote of the holders of stock trust certificates representing fifty-one per cent or more of the aggregate number of shares of the Capital Stock of the corporation represented by all of the Stock Trust Certificates in respect of which votes are cast."

A part of the prayer common to both complaints calls for a construction of the trust agreement to ascertain whether the parties intended that the provision for an amendment of the trust agreement by resolution of the trustees should include authority to them to amend the agreement by extending the duration of the trust, or whether it was intended that the language of the seventh article that it should "terminate in any event" at the end of the ten-year period be so construed as to leave the trustees

powerless to change the termination date. Parts of the prayer challenge the authority of 51 per cent or more of the holders of the trust certificates to confirm the extension resolution adopted by the trustees. Other relief prayed in the respective cases is special to the particular case.

In the *Olson case* the chancellor sustained the extension of the trust and dismissed the complaint. The Appellate Court reversed that part of the decree and remanded the cause, with directions to declare the amendment purporting to extend the trust to October 15, 1955, null and void and to dissolve the trust. (*Olson* v. *Rossetter,* 330 Ill. App. 304.) In the *Russ case* the chancellor dismissed the complaint, thereby sustaining the extension provided for in the resolution of the trustees. The Appellate Court affirmed the decree. *Russ* v. *Blair,* 330 Ill. App. 571:

The rules of construction which apply to the interpretation of contracts apply to the construction of trust instruments. (Volume 54, American Jurisprudence, Trusts, section 17.) The object of judicial construction of a written instrument is to ascertain the true intent of the parties and to carry it out, if it does not conflict with any rule of law or good morals or the declared public policy of the State. (*Parker-Washington Co.* v. *City of Chicago,* 267 Ill. 136.) It is not the function of a court to modify a contract or create terms new or different from those to which the parties have agreed.

Article 7 of each trust agreement deals exclusively with the termination of the trust and the procedure to be followed after such termination. As noted, the first section provides that the trust agreement "shall terminate in any event" on a specified date which is ten years following the date of the contract. Other sections of article 7 relate to a termination of the trust agreement prior to the expiration of the ten-year period, but there is no provision in article 7 or in any other part of the trust agreement which provides for termination following an extension provided

for by resolution of the trustees under the clause authorizing an amendment. In the *Olson case,* it was provided that within sixty days prior to two years immediately following the date of the contract, the trustees should conduct a referendum of the certificate holders to determine whether the trust agreement should terminate at the end of the two-year period. The procedure for such referendum is set forth in detail. An affirmative majority vote would terminate the trust at the end of the first two years. It was further provided that the trustees should conduct a referendum in 1939, 1941 and 1943. Authority was also given the trustees to terminate the trust at any time within the ten-year period by a resolution supported by two of the trustees. The procedure to be followed in event of a termination by either the referendum process or by resolution was set forth in detail, but the instrument is silent as to any right to terminate by either method in the event the trust was extended by resolution of the trustees under the clause providing for amendments. If, in the *Olson case,* resolutions adopted by the trustees were sustained, it would mean that the right the certificate holders had during the first ten-year period to express their wishes by referendum as to a termination of the trust would be denied them during the ten-year extension period.

Article 7 in the trust agreement of the *Russ case* required the trustees to hold a referendum within ninety days after the first year of the trust to determine whether holders of trust certificates representing a certain percentage of the aggregate should favor an immediate termination. It provided that a similar vote should be taken at the expiration of the third, fifth and seventh years of the ten-year period. Except as to the differences noted, the termination article 7 of the two trust agreements treated the matter of termination substantially the same. Since article 7 deals so extensively with methods of termination

that might be pursued within the ten-year period following the date of the contract, we believe the phrase, "shall terminate in any event" emphasizes an intent to fix a date beyond which the trust could not continue under any circumstances. The words "in any event" refer to events of the future and were comprehensive enough to include any circumstance pertaining to the duration of the trust that might arise. Article 7 deals solely with the subject of termination of the trust while the provision in reference to the power of the trustees to amend was contained in an article which pertained to several subjects and was designated "Miscellaneous."

In the *Olson case,* the duration of the trust was incorporated into the reorganization plan. In the *Russ case* the data filed with the Securities and Exchange Commission for registration purposes under the Federal act also referred to the termination of the trust. Defendants contend that the intent of the parties must be ascertained solely from the trust agreement and that reference cannot be had to these matters which preceded the trust agreement and to which the trustees of the corporations were not parties. It is true the defendant trustees had not been selected at the time of the reorganization plan or when the information was given the Securities and Exchange Commission. However, the trustees came into their respective positions as a result of the record submitted and approved in the reorganization proceedings. Section 4 of article 2 of the trust agreements provides that the registered holder or transferee of any stock trust certificate shall be subject to all the terms and conditions of the agreement in the same manner and with the same effect as though such holder and transferee had originally deposited the shares of stock represented by such stock trust certificate, and with like effect as if this agreement had been signed by them in person.

It is uncertain whether the parties to the trust agree-

ment, which in each case included the newly organized corporation of the one part, the bondholders or stockholders of the second part, and the trustees of the third part, intended that the power to amend should override the termination provisions of article 7 and give to the trustees the power to extend the trust. The rule is that where language has been used in a contract that is ambiguous, previous and contemporary transactions and facts may be taken into consideration to ascertain the true meaning of the contract and the sense in which the parties used the particular terms. *Wolf* v. *Schwill,* 289 Ill. 190; *Geithman* v. *Eichler,* 265 Ill. 579; *Storey* v. *Storey,* 125 Ill. 608.

The phrase "in any event" appears in the reorganization plan in the *Olson case* and is referred to in the answers in the questionnaire furnished the Securities and Exchange Commission in the *Russ case.* Article 2 of the reorganization plan in the *Olson case* contained the following language: "The beneficial owners of the stock will receive Trust Certificates which shall represent an interest in the income, avails and proceeds of the trust property of the same parity with all other Trust Certificates. The Trust Agreement will be for a period of ten years." It also contained a provision for a referendum on continuation of the trust at the end of every two-year period within the ten years, the same as was incorporated into article 7 of the trust agreement to which reference has already been made. It contains the sentence: "In any event, the Trust shall be terminated at the expiration of ten (10) years from the date of the original Trust Agreement."

In the questionnaire furnished the commission in the *Russ case* a question was asked as to the maximum period of duration of the agreement under which the trust certificates registered hereunder are proposed to be issued. The answer was "Ten years from August 15, 1935, the date of said agreement." In another answer referring to the duration of the trust, it was stated that the trust was

for ten years' duration "unless prior to that time the trust is terminated because of the sale or other disposition of the property or as otherwise provided in the stock trust agreement." And in another provision it is stated that the trust agreement should be for a period of ten years unless terminated at an earlier time by resolution supported by two trustees and confirmed by at least 51 per cent of the capital stock then held by the trustees. Thus the two records made in the prior transactions show that it was definitely stated that the trust should not exceed a ten-year period and that there is no express provision to be included in the trust agreement which would authorize the trustees to extend the period of the trust. We are of the opinion that the parties to the trust agreement never intended that the provision authorizing the trustees to alter, amend or modify the trust agreement should be construed to confer on them the authority to amend the trust agreement in so vital a part as to extend the period of its duration.

Plaintiffs in the *Olson case* complain of the attitude of the trustees toward them and the refusal of the trustees to furnish them with the names and addresses of the other certificate holders. It was also charged in the complaint in the *Russ case* that the trustees stepped aside from their fiduciary character to influence certificate holders to support their resolution extending the duration of the trust. Both of these matters involve elementary propositions of law pertaining to the duties of trustees and the fiduciary relationship in which they stand to the beneficial owners of the trust. Under the views expressed, it is not necessary to reiterate such fundamental principles pertaining to the duties of trustees.

The contention was made by the plaintiffs in the *Olson case* that the trustees had no authority to lease a part of the trust property to the Theater Amusement Company and it was prayed that said lease be canceled. Such con-

tention was rejected in the trial court and that decision was affirmed in the Appellate Court. It has not been renewed on this appeal.

The judgment of the Appellate Court in *Olson* v. *Rossetter,* No. 30159, is affirmed. The judgment of the Appellate Court in *Russ* v. *Blair,* No. 30194 is reversed and the cause remanded to the superior court of Cook County, with directions to enter a decree declaring the resolution of the trustees extending the trust beyond August 14, 1945, to be null and void,. and to proceed in conformity with the views expressed.

*No. 30159, judgment affirmed.*

*No. 30194, reversed and remanded, with directions.*